# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

DENNIS GILLILAND, )
)
    Petitioner, )      NO. 3:06-0361
)      JUDGE HAYNES
v. )
)
GLEN TURNER, Warden, )
)
    Respondent. )

## MEMORANDUM

Petitioner, Dennis Gilliland, filed this action under 28 U.S.C. § 2254, seeking the writ of

habeas corpus to set aside his state conviction for felony murder for which his sentence was

modified to life imprisonment. The Court appointed the Federal Public Defender to represent

Petitioner and an amended petition was filed. (Docket Entry No. 12). In his amended petition,

(Docket Entry No. 45), Petitioner asserts the following claims: (1) his actual innocence of the

crime; (2) trial counsel's failure to conduct an adequate investigation of his defense, including an

independent DNA analysis of the blood found in the victim's truck; (3) his trial counsel's failure

to have the prosecution conduct a DNA test for all persons whose blood matched the sample held

by the prosecution; and (4) his trial counsel's failure to cross-examine the prosecution's DNA

expert to disclose that the DNA results did not match Petitioner's DNA and the expert's

explanation of the blood in the victim's truck. Petitioner's amended petition also incorporates by

reference claims in the <u>pro se</u> petition for trial counsel's failure to request a jury instruction on

alibi; to seek a dismissal of the felony murder charge instead of the premeditated first degree

murder charge; and to challenge the jury's viewing Petitioner in handcuffs.

## A. Procedural History

Petitioner was convicted by a jury of premeditated first degree murder and felony murder, but the trial court vacated the verdict on the first degree murder conviction. State v. Gilliland, 1998 WL 800191, at *1 (Tenn. Ct. Crim. App. Nov. 19, 1998). The Tennessee Court of Criminal Appeals affirmed the felony murder conviction, but remanded for resentencing. Id. On appeal, the Tennessee Supreme Court affirmed Petitioner's conviction, but concluded that the admission of the Petitioner's prior shooting was error, albeit harmless error. Gilliland v. State, 22 S.W.3d 266 (Tenn. 2000).

Petitioner then filed a post-conviction petition that the trial court denied, and on appeal, the Tennessee Court of Criminal Appeals affirmed. Gilliland v. State, 2003 WL 22703222 (Tenn. Ct. Crim. App. Nov. 14, 2003). The Tennessee Supreme Court denied Petitioner's application for permission to appeal. Id. Petitioner filed another action under Tennessee's DNA Analysis Act that the Tennessee courts rejected. Gilliland v. State, 2008 WL 624931 (Tenn. Ct. Crim. App. March 3, 2008). The latter ruling gives rise to the threshold issue in this action, namely Petitioner's request for discovery and an evidentiary hearing.

## B. Discovery

Petitioner seeks discovery for DNA testing of the remaining fluid sample collected in the State's investigation of the underlying murder. Petitioner also seeks documents on the blood that prosecutors subjected to DNA testing. Petitioner argues that Tennessee state courts' ruling precluded this discovery and Petitioner did not have an opportunity to request such discovery, citing Tennessee Supreme Court Rule 28 §§ 6(c)(7), (7)(A). In response, the Respondent argues that Petitioner pursued the DNA testing sought here in state courts that properly rejected

2

Petitioner's request for DNA testing.

From a review of the state court record, in his second post-conviction action, Petitioner requested DNA testing of the fluid sample in the State's custody. After the trial court's denial of that request, Petitioner argued on appeal that the specimen removed from the victim's vehicle contained a trace amount of DNA from an unidentified individual and this fluid may contain biological evidence to establish the identity of the murderer. In essence, the Petitioner asserts that he is not the perpetrator of this offense and that testing of this sample will prove his actual innocence. The Tennessee appellate court rejected this request and reasoned as follows:

> **First, we must note that the State is correct that such analysis was not requested by the Petitioner in his original petition.** See Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."). **Notwithstanding any possible waiver, the Petitioner's request for further testing must fail.**
>
> The Act only permits "the performance of a DNA analysis which compares the [P]etitioner's DNA samples to DNA samples taken from biological specimens gathered at the time of the offense." See Earl David Crawford v. State, No. E2002-02334-CCA-R3 -PC, 2003 WL 21782328, at *3 (Tenn. Ct. Crim. App., Knoxville, Aug. 4, 2003). Thus, **the Act does not permit DNA analysis to be performed upon a third party. "[T]he results of the DNA testing must stand alone."** See Sedley Alley v. State, No. W2004-01204-CCA-R3-PD, 2004 WL 1196095, at *10 (Tenn. Ct. Crim. App., Jackson, May 26, 2004). **The specimens retrieved from the vehicles in this case have already been compared to the Petitioner's and the victim's blood samples. This evidence was available to the Petitioner at the time of trial and was used by the State at trial as evidence of the Petitioner's guilt.** See Gilliland, 1998 WL 800191, at *4. **Further testing would not resolve any issue not resolved by the previous analysis.**
>
> Finally, as the State argues, **identifying the donor of the trace amount of DNA in the victim's vehicle would not exonerate the Petitioner as the perpetrator of the murder of Bobby Bush. The Petitioner seeks DNA testing in order to establish the identity of this third party. Such evidence, however, would at best simply establish that this third party had, at some point in time (but not**

3

**necessarily at the time of the crime), had contact with the victim.** See A ley, 2004 WL 1196095, at *10. On direct appeal, this Court summarized the evidence sufficient to uphold the Petitioner's conviction:

\*   \*   \*

Contrary to the assertions of the Petitioner, **the determination of the identity of this unidentified individual will not eliminate him as the perpetrator of this murder. Accordingly, we conclude that the post-conviction court has not abused its discretion in finding that the Petitioner had not established the qualifying criteria for DNA testing and that summary dismissal was appropriate.**

Gilliland, 2008 WL 624931, at **3-4 (emphasis added).

Rule 6(a) of the Rules governing Section 2254 actions provides for discovery under a good cause standard.

"A party shall be entitled to invoke the processes of discovery available under the Federal Rules of Civil Procedure if, and to the extent that, the judge in the exercise of his discretion and for good cause shown grants leave to do so, but not otherwise."

As stated by the Sixth Circuit in Stanford v. Parker, 266 F.3d 442 (2001), in a habeas action as a general rule:

Habeas petitioners have no right to automatic discovery. A district court has discretion to grant discovery in a habeas case upon a fact specific showing of good cause under Rule 6. See Bracky v. Gamley, 520 U.S. 899, (1997); Byrd v. Collins, 209 F.3d 486, 515-16 (6th Cir. 2000). . . . The burden of demonstrating the materiality of information requested is on the moving party. See Murphy v. Johnson, 205 F.3d 809, 813-15 (5th Cir. 2000).

The district court applied the correct legal standard in light of the evidence and the state court proceedings. The discovery sought by Stanford would not resolve any factual disputes that could entitle him to relief, even if the facts were found in his favor. To the contrary, Stanford's requested discovery, when reviewed in light of the recently examined record, falls more in the category of a fishing expedition. We will not find that a district court erred by denying a fishing expedition masquerading as discovery.

4

Id. at 460.

Moreover, "[c]onclusory allegations are not enough to warrant discovery under [Rule 6]; the petitioner must set forth specific allegations of fact." Ward v. Whitley, 21 F.3d 1355, 1367 (5th Cir. 1994). In Williams v. Bagley, 380 F.3d 932, (6th 2004), the Sixth Circuit explained that for discovery in a habeas action is permissible "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is ... entitled to relief."

Discovery must also be considered in the context of 28 U.S.C. § 2254(e)(1) on the presumptive correctness of state court findings.

> Because Petitioner failed to rebut the statutory presumption of correctness that the federal habeas court must award to the factual findings of the state courts, the district court properly concluded that it was required to defer to those factual findings. Furthermore, given this conclusion, we would be hard-pressed to say that the district court abused its discretion in denying further discovery on these issues.

Byrd v. Collins, 209 F.3d 486, 516 (2000). Consideration of Section 2254(e)(2) on failure to develop the state record and the precedents thereunder, discussed infra, are also relevant given that discovery is intended to supplement the state record.

Since 2001, DNA discovery has been available under Tennessee law for post-conviction proceedings, the "Post-Conviction DNA Analysis Act of 2001." Tenn. Code Ann. § 40-30-301 et seq. Under this Act, notwithstanding the provisions of part 1 of this chapter, or any other provision of law governing post-conviction relief to the contrary, **a person convicted of** and sentenced for the commission of first degree murder, second degree murder, aggravated rape, of any of these offenses, **any lesser included offense of these offenses**, or at the direction of the

5

trial judge, any other offense, **may at any time, file a petition requesting the forensic DNA analysis of any evidence that is in the possession or control of the prosecution, law enforcement, laboratory, or court, and that is related to the investigation or prosecution that resulted in the judgment of conviction and that may contain biological evidence"**. Tenn. Code Ann. § 40-30-303 (emphasis added).

Petitioner has not made any showing based upon expert testimony or other evidence challenge the State courts' factual findings on the lack of significance of any further DNA testing. The Court concludes that Petitioner has not presented any reason to challenge these State court findings and that Petitioner's request for discovery should be denied.

### C. Evidentiary Hearing

Petitioner's request for an evidentiary hearing is based upon his request for DNA testing and his ineffective assistance of counsel claims. In the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 110 Stat. 1214, Congress redefined the standards for conducting an evidentiary hearing in a habeas action in amending Section 2254 to provide as follows:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that - (A) the claim relies on - (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable fact-finder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2).

In <u>Williams v. Taylor</u>, 529 U.S. 420 (2000), the Supreme Court stated that under Section

6

2254(e)(2), the initial focus on whether to conduct an evidentiary hearing, is whether the

petitioner exercised diligence in developing the state record and that diligence depends, in part,

on whether the petitioner or his counsel knew of the matters at issue and failed to pursue the

matter in the state courts:

> The question is not whether the facts could have been discovered but instead
> whether the prisoner was diligent in his efforts. . . . **Diligence for purposes of the
> opening clause [of Section 2254(e)(2)] depends upon whether the prisoner
> made a reasonable attempt, in light of the information available at the time,
> to investigate and pursue claims in state court**; it does not depend, as the
> Commonwealth would have it, upon whether those efforts could have been
> successful.
>
> * * *
>
> For state courts to have their rightful opportunity to adjudicate federal rights, **the
> prisoner must be diligent in developing the record and presenting, if possible,
> all claims of constitutional error. If the prisoner fails to do so, himself or
> herself contributing to the absence of a full and fair adjudication in state
> court, § 2254(e)(2) prohibits an evidentiary hearing to develop the relevant
> claims in federal court, unless the statute's other stringent requirements are
> met. Federal courts sitting in habeas are not an alternative forum for trying
> facts and issues which a prisoner made insufficient effort to pursue in state
> proceedings.**
>
> * * *
>
> Given knowledge of the report's existence and potential importance, a diligent
> attorney would have done more. Counsel's failure to investigate these references
> in anything but a cursory manner triggers the opening clause of § 2254(e)(2).

Id. at 435, 437, 439-40 (emphasis added).

Independent of § 2254(e)(2), the Court possesses the inherent authority to set an

evidentiary hearing in a habeas action. Harries v. Bell, 417 F.3d 631, 635 (6th Cir. 2005);

Abdur'Rahman v. Bell, 226 F.3d 696, 705-06 (6th Cir. 2000). "[A] district court does have the

inherent authority to order an evidentiary hearing even if the factors requiring an evidentiary

7

hearing are absent." Abdur'Rahman, 226 F.3d at 705. Such hearings are set "to settle disputed issues of material fact." Id. at 706. This authority extends to where an inadequate record exists to decide a procedural default controversy. Alcorn v. Smith, 781 F.2d 58, 60 (6th Cir. 1986).

Yet, "[i]f [the court] concludes that the habeas applicant was afforded a full and fair hearing by the state court resulting in reliable findings, [the court] may, and ordinarily should accept the facts as found in the hearing. But [the court] need not. In every case [the court] has the power, constrained only by [its] sound discretion, to receive evidence bearing upon the applicant's constitutional claim." Abdur'Rahman, 226 F.3d at 705 (quoting Townsend v. Sain, 372 U.S. 293, 318 (1963)). Even prior to AEDPA, a habeas petitioner had to show cause for his failure to develop the state record or that "a fundamental miscarriage of justice would result from failure to hold a federal evidentiary hearing," Keeney v. Tamayo-Reyes, 504 U.S. 1, 11-12 (1992). Moreover, the Supreme Court has stated that: "The state court is the most appropriate forum for resolution of factual issues in the first instance and creating incentives for the deferral of fact-finding to later federal court proceedings can only degrade the accuracy and efficiency of judicial proceedings." Id. at 9. Accord Byrd v. Collins, 209 F.3d 486, 516-17 (6th Cir. 2000) (quoting Keeney).

In a word, the distinction between § 2254(e)(2) and the Court's inherent authority to order an evidentiary hearing is whether "a petitioner is entitled to a hearing [under § 2254(e)(2)] . . . versus whether a district court has the inherent discretion to order a hearing [that] is still intact following Williams." Abdur'Rahman, 226 F.3d. at 706.

Petitioner contends that he was unaware of the evidence that could have been discovered by his counsel and cites the potential of Brady v. Maryland, 373 U.S. 83 (1963) material based

8

upon the DNA testing. Respondent contends that Petitioner's trial counsel was cross-examined in the state post-conviction proceeding. Other than the request for DNA testing, there is not any showing of any specific proof that was not before the state court on Petitioner's ineffective assistance of counsel claims. Here, Petitioner had a full opportunity to conduct an examination of his trial counsel in the state court. There is not any showing that the State's proof and the state courts' findings about DNA are erroneous. In such circumstances, the Court deems an evidentiary hearing unnecessary.

### D. Merits of Petitioner's Claim

### 1. Review of the State Court Record

In his direct appeal, the Tennessee Court of Criminal Appeals summarized the facts[1] of Petitioner's conviction as follows:

> On July 19, 1995, the defendant asked his mother for gas money. She first offered $10, but the defendant replied he needed more so she gave him $20. The defendant arrived at a local bar called "Daisy Dukes" at approximately 9:30 p.m. that evening. There he joined Ronnie Murphy.
>
> After spending approximately three (3) hours in the bar, the defendant and Murphy left. Murphy testified that the defendant encountered Eddie Christy in the parking lot of the bar. The defendant told Christy about a shooting several weeks earlier wherein the defendant fired .20 gauge shotgun slugs at two (2) brothers named Walton. Both brothers were killed. The grand jury declined to indict the defendant, concluding the homicides were justifiable. Murphy testified that the defendant produced a .20 gauge single-shot shotgun from his truck to show Christy. Murphy observed a box of slug ammunition on the front seat of the defendant's truck at that time.
>
> The defendant followed Murphy to Murphy's house where Murphy left his truck. They proceeded in the defendant's truck to a convenience store to buy beer,

---

[1] State appellate court opinion findings can constitute factual findings in a habeas action, Sumner v. Mata, 449 U.S. 539, 546-47 (1981), and have a statutory presumption of correctness. 28 U.S.C. § 2254(d).

arriving sometime after midnight. There was a discussion as to whether they had enough money to purchase the beer. The beer was ultimately purchased on the credit ticket of the defendant's father.

The defendant and Ronnie Murphy drove to Donnie Murphy's house. Donnie Murphy was not at home. Ronnie Murphy and the defendant went to the basement to play pool and drink beer. Shortly thereafter, Donnie Murphy and the victim, Bobby Bush, arrived at the house.

Donnie and Ronnie Murphy, the defendant, the victim and a person named Michael Heath played pool and drank beer in the basement. Ronnie Murphy and Michael Heath eventually left, leaving the defendant with Donnie Murphy and the victim. The victim began discussing the prior shootings with the defendant. Donnie Murphy testified that the victim did not believe the defendant's statement that he shot the Walton brothers with .20 gauge shotgun slugs from a distance of seventy-five (75) yards. The defendant then retrieved a .20 gauge shotgun from his truck. When the defendant opened the breech, a .20 gauge slug shell was ejected onto the floor.

The victim then pulled from his pocket at least two (2) $100 bills and several other bills, stating that he would bet all of the money that he too would have shot the brothers if faced with the same situation. The defendant looked at the victim's money and stated that he was not impressed. The victim responded that he was not attempting to impress the defendant.

Around 3:20 a.m., the victim said he was going to drive home. Donnie Murphy attempted to dissuade the victim from doing so, as he had consumed numerous beers and had a previous DUI conviction. The victim persisted and departed, stating that he planned to travel home by a route not frequented by the police. The defendant left shortly after the victim, stating he would drive by the victim's house to make sure that he arrived safely. He took a cooler containing the group's remaining beer.

Beverly Sue Heath was a neighbor of the victim. At approximately 4:10 a.m. on the morning in question she saw a vehicle driving down the road in front of her house "throwing sparks" and sounding as if it had a flat tire.

Vera Bush, the victim's mother, testified that she awoke briefly at 3:00 a.m. that morning and noticed her son was not at home. She woke again at 4:45 and noticed her son's wrecked truck parked in an unusual place. The victim had an elaborate method of parking his truck as it did not have an operable reverse gear. The victim was neither in the truck nor the house.

10

The defendant ran out of gas that morning around 5:30. He approached Oda Lovins' house and asked him for a ride to a gas station. The defendant pumped $5 worth of gas in a can and offered to tip Lovins $10 for his effort. Lovins observed a "fairly good wad of bills" in the defendant's billfold. After fueling his truck from the can, the defendant drove back to the station and purchased gasoline for which he paid $21 in cash.

The defendant then drove to the farm of Bill Freeman. Freeman stated that he had known the defendant for only eighteen (18) months and was not sure why the defendant came by his house that morning. The defendant began talking about the Walton homicides. Later that day Freeman discovered a cooler of beer on his truck, and a farmhand related that he saw a truck similar to the defendant's driving away from the farm.

From the Freeman farm, the defendant proceeded to Green's Market where he purchased a case of beer with $20 cash. He then drove to Clarksville where he ate breakfast at a pancake restaurant and rented a room at the Quality Inn. The defendant paid $44 in cash for the room, rented a movie for $7, and tipped the maid $5 for delivering the movie to the room.

A mail carrier discovered the victim's body lying along a road in rural Houston County around 10:30 that morning. The victim, who had a large sum of currency the previous evening, had only change in his pocket when found.

The defendant's whereabouts for the rest of the day are disputed. The defendant claimed to have visited a riverfront park after leaving the pancake restaurant, then to have traveled back to the "old Lock B bottoms" where he remained until that evening when he presented himself at the Dickson County Sheriff's office. The state presented evidence of the defendant's stay at the Quality Inn in Clarksville.

Lieutenant Randy Starkey with the Dickson County Sheriff's Office testified that he was at the Sheriff's Station No. 2 on the evening of July 20, 1995, when the defendant arrived at the station and engaged him in conversation. Starkey stated that the defendant had been to the station several times as a result of the investigation of the Walton homicides. Thus, when the defendant mentioned drinking beer with the victim at the Murphy residence the previous night, Starkey became interested. He asked the defendant what the defendant knew about the victim. The defendant asked if the victim had gotten into some trouble. Starkey then related the story of the victim being found murdered that morning.

Investigator Ted Tarpley and TBI Agent Steve Watkins testified that they were advised by the victim's family shortly after beginning their investigation that the defendant should be considered as a potential suspect. They soon learned the

11

defendant was already at the Sheriff's Station No. 2.

The defendant related his version of the previous evening's events to the officers. The defendant neglected to tell the officers about running out of gas, buying beer and renting a motel room that morning. The defendant told the officers he spent the night watching three (3) barges at the river bottoms.FN2 The defendant related that he had only $5 in his possession at that time. The fact that the defendant was carrying a shotgun was discovered in normal conversation. Agent Watkins went to the defendant's truck and seized a breeched, unloaded .20 gauge shotgun. Watkins also noticed that the interior of the truck appeared to have been washed recently. Water was pooled in the floorboard, and the truck appeared cleaner than would be expected after driving on gravel roads. The bed was noticeably dirtier than the rest of the truck.

> FN2. Raymond D. Wilson was the operator on duty at a lock and dam eight (8) miles from the location where the defendant claims to have spent the evening after leaving the Murphy home. Wilson reported no river traffic in the time frame the defendant claimed to have seen the three (3) barges.

During initial questioning of the defendant, Agent Watkins received a telephone call that he should investigate the Liberty Church Cemetery as a source of possible leads in the victim's death. The defendant was asked to remain voluntarily at the station while officers investigated the cemetery. Officer C.J. Butts testified that during this time the defendant walked freely in and out of the station; and, although he was usually accompanied, the defendant did have an opportunity to be alone outside of the station that evening.

Earlier in the day, Liberty Church Cemetery was reported to authorities as a site of vandalism. The cemetery is located in Dickson County, a short distance from the victim's residence. Closer inspection revealed a vehicle had driven into the cemetery and knocked over four or five headstones. It was later determined that the victim's truck had knocked the stones over, coming to rest on one of them. A wider set of tracks was also detected at the scene. It was theorized by the state that a larger vehicle pulled the smaller vehicle out of the cemetery. Subsequently, TBI agents were able to show paint on the bumper of the defendant's truck consistent with paint from the victim's truck.

When the officers returned to the station, the defendant was read his rights and his truck was formally seized. The defendant maintained his version of events as previously related to the officers. During questioning, the defendant stated that he had never been inside the victim's truck, nor had the victim been in his. The defendant was arrested for the victim's murder.

12

The next day two sets of currency were found on the grounds of Sheriff's Station No. 2. The first, $35, was folded and wet and found near a downspout. The second set, $120, was found shortly thereafter and was dry.

At trial, the state presented forensic evidence that the victim died as a result of a .20 gauge shotgun slug being fired into his head from a distance of less than thirty-six (36) inches. TBI agents testified as experts about blood traces removed from the defendant's truck. A forensic scientist, established as an expert in DNA testing, found the blood to be consistent with the victim's blood. The probability of randomly selecting another Caucasian, unrelated to the victim and having the same DNA profile as the blood found in the defendant's truck, was one in 286,000.

Gilliland, 1998 WL 800191, at **1, 2, 3, 4.

In its review, the Tennessee Supreme Court found the State's proof sufficient to support

Petitioners' felony murder conviction.

Although the State's case against the appellant was primarily grounded in circumstantial evidence, a careful review of the entire transcript clearly establishes that the evidence was more than sufficient to support a verdict of guilt beyond a reasonable doubt. According to the State's theory, the appellant murdered Bobby Bush in order to steal the substantial sum of money that Bush was known to be carrying. To this end, the State presented evidence showing that although the appellant had only about fifteen or twenty dollars earlier in the evening prior to Bush's murder, the appellant was somehow able to spend over $100 in cash after 3:00 a.m. on July 20, 1995. The State also showed that while Bush was carrying over four-hundred dollars on July 19, he only had a small amount of change in his pockets when his body was found the next day. Further, the State established that the appellant lied about his whereabouts during the early morning of July 20,FN9 and one witness who saw him during this time testified that the appellant had a "pretty good wad of bills" in his wallet. Blood consistent with that of the victim was also found in the appellant's truck,FN10 and although the appellant and the victim were not together earlier in the evening, paint from the appellant's truck was found on the rear bumper of the Bush's truck.FN11 Last, the State showed that the victim was shot in the head with a 20-gauge shotgun at point-blank range by the same type of Remington slugs possessed by the appellant.FN12

FN9. Before he left his friend's house on the early morning of July 20, the appellant stated that he was going to follow Bush to make sure that he got home safely. The appellant later stated that he did not follow Bush home, but instead went to the old Lock B bottoms

13

eight miles north of Cheatham Dam, which is near Ashland City. Although the appellant stated that he was at the lock until daylight, he later stated that he saw no boat traffic on the river.

To rebut the veracity of these statements, the State offered witnesses who saw and talked with the appellant during the time he said that he was at the locks. Further, the State introduced evidence that one tug boat and eleven barges cleared the Cheatham Dam lock around 1:00 a.m. on July 20 heading toward old Lock B, with the inference being that the appellant should have seen at least some river traffic.

FN10. **Blood was found in the passenger seat and on the top of the passenger side cushion in the appellant's truck. An expert for the State testified that the DNA profile of this blood was consistent with that of Bobby Bush, and that only one person in 286,000 would have a consistent profile.**

FN11. The State offered this evidence to show that contrary to the appellant's statements, the appellant and the victim were together at some point after 3:00 a.m. on July 20. According to the testimony developed by the State, the victim and his truck apparently got stuck in a local cemetery during the early morning of July 20, 1995. Because tire marks in the cemetery showed that a larger truck pulled a smaller truck out of the cemetery, the State hypothesized that the appellant used his truck to pull Bush's out of the cemetery, which is why paint on the rear bumper of Bush's truck matched the color and consistency of the paint on the tailgate of the appellant's truck. Investigators established that Bush's truck was in the cemetery because they found in the cemetery a broken blinker from Bush's truck, Bush's cigarette lighter, and a pack of cigarettes the victim was known to have smoked.

FN12. Police investigators seized two boxes of the exact same type of Remington slugs later from the appellant's truck.

Although the State was only able to introduce circumstantial evidence of the appellant's guilt, we conclude that the evidence is overwhelmingly consistent with the guilt of the accused, that it is inconsistent with his innocence, and that it excludes every other reasonable theory or hypothesis except that of guilt. . . . In light of the overwhelming evidence of guilt, therefore, we conclude that the error in admitting evidence of the appellant's role in shooting the Walton brothers did not affirmatively affect the outcome of the trial on its merits. Accordingly, the

14

appellant's conviction for felony murder must be sustained.

Gilliland, 22 S.W.3d at 274-75 (emphasis added). The state courts' findings on Petitioner's other claims will be presented with the analysis of the individual claim.

## 2. Conclusions of Law

This action is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Lindh v. Murphy, 521 U.S. 320, 336 (1997). Under the AEDPA, federal courts may not grant habeas relief for claims adjudicated on their merits in a state court proceeding, unless that state court proceeding:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d).

In Williams v. Taylor, 529 U.S. 362, 413 (2000), the Supreme Court stated that a state court judgment is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court on a set of materially indistinguishable facts." In such instances, the Supreme Court held that a federal habeas court may grant a writ. Id. The Supreme Court interpreted the language "clearly established Federal law, as determined by the Supreme Court of the United States" as referring to "holdings as opposed to dicta" of its decisions at the time of the state court decision. Id. at 412. Moreover, the relevant analysis is "to apply a rule of law that was clearly established at the time the Petitioner's state court

15

conviction became final." Id. at 390; accord Joshua v. DeWitt, 341 F.3d 430, 436 (6th Cir. 2003). In Bell v. Cone, 535 U.S. 685, 693 (2002), the Court reiterated that AEDPA modified a federal court's role in reviewing state prisoner applications "in order to prevent federal habeas 'retrials' and to ensure that state court convictions are given effect to the extent possible under the law."

Under the "unreasonable application" clause, the Supreme Court stated that a state court judgment results in an "unreasonable application" of clearly established federal law "if the state court correctly identifies the governing legal principle from [the Supreme Court's] decision but unreasonably applies [that principle] to the facts of the particular case." Id. at 694. The district court "must presume that all determinations of factual issues made by the state court are correct unless the defendant can rebut that presumption by clear and convincing evidence." Mitchell v. Mason, 325 F.3d 732, 737-38 (6th Cir. 2003) (citing 28 U.S.C. § 2254(e)(1)).

### 1. Ineffective Assistance of Counsel

Petitioner's claims as to his trial counsel's performance are that (1) due to trial counsel's failure to proper investigate the case, including an independent DNA analysis of the blood found in the victim's truck; (2) his trial counsel's failure to have the prosecution's DNA test for all persons whose blood matched the sample held by the prosecution; (3) his counsel's failure to cross-examine the prosecution's DNA's expert to disclose that the DNA results did not match Petitioner's DNA and the expert's flawed explanation of the blood in the victim's truck; (4) his trial counsel's failure to cross-examine the prosecution's DNA's expert to disclose that the DNA results did not match Petitioner's DNA and the expert's explanation of the blood in the victim's truck; (5) trial counsel's failure to request a jury instruction on alibi; (6) trial counsel's failure to seek a dismissal of the felony murder charge instead of the premeditated first degree murder

16

charge; and (7) trial counsel's failure to challenge the jury's viewing Petitioner in handcuffs. Of these claims, Petitioner presented only claims 5 through 7 to the state courts.

On the latter ineffective assistance of counsel claims, the Tennessee appellate court made the following findings:

> Counsel testified and explained that the Bush homicide charges were originally returned against the petitioner in Houston County. Following a preliminary hearing, counsel was asked to accept an appointment to undertake the petitioner's defense because conflicts of interest had disqualified other local attorneys. After counsel had been in the case for approximately seven months, the charges in Houston County were dismissed, and the petitioner was reindicted in Dickson County.

> **Counsel testified that a considerable amount of pretrial investigation was performed on the petitioner's behalf. In addition to counsel's efforts, an investigator and another assistant worked on the case and met and discussed issues with the petitioner. Counsel met with the petitioner's family members and obtained useful leads and information from them. He interviewed all known witnesses, except one person who refused an interview. He visited the crime scene and traveled to Nashville to interview Dr. Charles Harlan about his autopsy and to discuss the cause of death.**

> **Counsel said that the theory of defense was that the petitioner was not Bush's assailant. In developing that defense, counsel testified that he moved to exclude any testimony about the petitioner's involvement in the Walton shootings. The trial court denied the motion, but the supreme court later agreed with defense counsel that it was error to admit the evidence. The error, however, was ruled harmless.**

> Counsel testified that various strategies were used to deal with the circumstantial elements of the state's case. **Counsel uncovered photographic evidence that allowed the defense to argue that the crime scene at Liberty Church Cemetery had been badly contaminated. Counsel was aware that the state intended to offer expert DNA testimony about blood traces found in the petitioner's truck that was consistent with the victim's blood. From counsel's investigation, the presence of the blood could be accounted for based on the victim's presence in the petitioner's truck on an earlier occasion and/or transference while the investigating officers were collecting evidence. Regarding the money found at the police station, counsel moved unsuccessfully to exclude that evidence as speculative and prejudicial.**

17

**Counsel maintained that it was never clear from the evidence introduced how much money the petitioner actually had.**

Counsel testified that one of the important issues in the case was the petitioner's whereabouts before and after the homicide. The petitioner had given a statement to law enforcement officials about going to Lock B to look for a woman, after which he stayed at the lock bottoms drinking and watching the barge traffic and later went to Clarksville. The state had a witness, the lock and dam operator on duty, who was prepared to testify that there was no barge traffic during the time period that the petitioner claimed to have seen barges. Counsel testified that his investigator uncovered information that river traffic was only logged in and out when the barges were close to the lock or dam and that the petitioner was eight miles from that site.

Counsel was asked and acknowledged that on three different occasions jurors saw the petitioner in handcuffs as he was being transported to the courtroom. The first two times, counsel testified that he complained to the trial judge in chambers and was assured that the problem would be resolved. When the petitioner was seen the third time in handcuffs, counsel stated that he objected on the record and later argued undue prejudice. Counsel admitted that he did not move for a mistrial.

Regarding the jury verdicts, counsel's memory was inadequate to relate any specifics of what took place. He recalled that the jury returned guilty verdicts on both the premeditated and felony murder counts. However, counsel testified that he was uncertain whether he moved to dismiss the premeditated murder verdict or whether the trial court <u>sua</u> <u>sponte</u> dismissed that charge because the state had failed to prove premeditation.

<u>Gilliland</u>, 2003 WL 22703227, at * *4-5 (emphasis added).

In evaluating this proof, the State courts did not find any deficiency or prejudice in trial counsel's performance on the claims presented to them:

The petitioner first insists that former counsel's services were deficient and prejudicial because he did not submit a requested jury instruction on alibi. The petitioner's argument, however, merely rehashes his primary complaint that an instruction was not given and does not address counsel's alleged ineffectiveness. The petitioner has wholly failed to sustain his post-conviction burden with respect to this complaint.

**From counsel's testimony at the post-conviction hearing, it is abundantly clear that counsel invested considerable time in his factual and legal**

18

**investigation of the case. Counsel's testimony stands uncontradicted that he**
went to the crime scene, interviewed all available witnesses, traveled to Nashville
to discuss the homicide with the medical examiner, uncovered independent
evidence of crime scene contamination, filed appropriate motions to exclude
evidence of the prior shootings and the recovery of money at the police station,
**developed a strategy to account for the anticipated DNA evidence,** and
communicated frequently with his client and the client's family. This court will
not second-guess counsel's trial strategy, resting as it does on an objectively
reasonable investigation. See Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997)
(in addressing attorney performance, courts are not to "second guess" tactical and
strategic choices or to measure attorney's representation by "20-20 hindsight").

Furthermore, we are not convinced that the trial evidence adequately raised the
question of alibi. In State v. Byron Looper, No. E2001-01550-CCA-R3-CD
(Tenn. Ct. Crim. App., Knoxville, Feb. 3, 2003), perm. app. denied (Tenn., Jul. 7,
2003), the court quoted with approval from Black's Law Dictionary defining
"alibi" as "[a] defense based on the physical impossibility of a defendant's guilt by
placing the defendant in a location other than the scene of the crime at the relevant
time." Id., slip op. at 38 (quoting Black's Law Dictionary 72 (7th ed.1999)). The
court further explained, "[A] defendant in close enough physical proximity to
have committed the crime may deny the criminal activity and may affirmatively
assert that he was elsewhere at the critical time. However, if the asserted alternate
location is such that, based on the version of events contended for by the defense,
it would remain within the realm of physical possibility for the defendant to have
committed the crime, then the defense is nothing more than a denial and would
not rise to the level of alibi." Id., slip op. at 39 (quoting Owens v. State, 809
So.2d 744, 746-47 (Miss. Ct. App. 2002)).

Measured by the foregoing standard, **we do not believe that the defense of alibi
was fairly raised by the evidence at the petitioner's trial.**

Next, the petitioner argues in conclusory fashion that trial counsel was ineffective
in requesting or allowing the trial court to dismiss the jury's guilty verdict on the
premeditated murder charge and, instead, to enter a judgment on the felony
murder conviction.

The law is settled that premeditated murder and felony murder are not separate
offenses, but different theories of guilt for the crime of first degree murder. There
is no bar to verdicts, as in this case, being returned on both counts. The verdicts
stand as "legitimate finding[s] of fact which the trial court should preserve by
merging ... into one judgment of conviction." State v. Addison, 973 S.W.2d 260,
267 (Tenn. Ct. Crim. App. 1997). In this case, it does not appear that the jury
verdicts were merged into one judgment of conviction for first degree murder.

19

Rather, it appears that after the verdicts were returned, the trial court examined the legal sufficiency of the evidence, found evidence of premeditation to be lacking, and vacated the jury's verdict on that theory of first degree murder. See Dennis R. Gilliland, No. 01C01-9707-CC-00256, slip op. at 2 n. 1.

**We fail to see how counsel can be held constitutionally ineffective as the petitioner claims. The petitioner was not entitled to pick or choose which count or verdict to dismiss. That decision was driven by the legal sufficiency of the evidence, not the petitioner's preference or trial counsel's effectiveness.**

Moreover, even had the trial court set aside or vacated the felony murder conviction, the state would have been afforded the opportunity to appeal that ruling. See Tenn. R.Crim.App. 29(c) ("The state shall have the right of appeal where the court sets aside a verdict of guilty and enters a judgment of acquittal."). **Inasmuch as the legal sufficiency of the evidence supporting the felony murder conviction previously was challenged unsuccessfully on direct appeal, no possible showing of prejudice can be made in the context of ineffective assistance of counsel.**

The petitioner's final ineffectiveness complaint is equally vague and conclusory. He argues that counsel "failed to point out relevant arguments regarding the Defendant being seen in handcuffs" and that the jury's verdict shows that it "did not listen to or follow the instructions of the trial court." **The petitioner raised the issue on direct appeal that he was unfairly prejudiced when he appeared before the jury in handcuffs. This court rejected the issue on the basis that the trial court had given curative instructions to the jury to disregard any glimpses of the petitioner in restraints. See Dennis R. Gilliland, slip op. at 11-12.**

\* \* \*

**[P]etitioner simply has not demonstrated the requisite prejudice required to successfully challenge counsel's effectiveness**

Gilliland, 2003 WL 22703227, at \*\* 7-8, 9. (emphasis added).

The Sixth Circuit summarized Supreme Court precedents and identified two broad categories of ineffective assistance of counsel claims: (1) the actual or effective absence of counsel at a critical stage of the proceeding for which a presumption of prejudice arises; and (2) counsel whose performance was deficient on specific issues and that deficiency

20

was demonstrably prejudicial to the defendant.  As the Sixth Circuit explained:

> In Cronic[2], the Supreme Court held that an appeals court must reverse a criminal defendant's conviction "without any specific showing of prejudice to defendant when counsel was either totally absent, or prevented from assisting the accused during a critical stage of the proceeding." . . . In Williams[3], the Supreme Court confirmed the vitality of this "per se" approach, noting that while the Strickland v. Washington, 466 U.S. 668 (1984), test for ineffective assistance of counsel, requiring proof of deficient performance and prejudice, provides guidance for resolving virtually all ineffective assistance of counsel claims, there are "a few situations in which prejudice may be presumed."  We have recently applied the presumption-of-prejudice test to a claim of ineffective assistance of counsel.

Mitchell v. Mason, 325 F.3d 732, 740 (6th Cir. 2003) (citations and parentheticals omitted).

Within the first category are three types of cases warranting the presumption of prejudice arising from counsel's acts or omissions:

> The first is the complete denial of counsel, in which "the accused is denied the presence of counsel at 'a critical stage.'" Bell, 122 S.Ct. at 1851 (quoting Cronic, 466 U.S. at 659). The second is when counsel "'entirely fails to subject the prosecution's case to meaningful adversarial testing.'" Id. (quoting Cronic, 466 U.S. at 659). The third is when counsel is placed in circumstances in which competent counsel very likely could not render assistance.

Id. at 742.  Petitioner's claim does not fall within any of these categories and thus, a "strong presumption" arises that petitioner's counsel provided reasonably effective assistance. Strickland, 466 U.S. at 689.

Under Strickland, counsel's performance must be both inadequate and prejudicial to the defense.

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.

---

[2]  United States v. Cronic, 466 U.S. 648 (1984)

[3]  Williams v. Taylor, 529 U.S. 362 (2000).

21

Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

466 U.S. at 687.

For Petitioner's ineffective assistance of counsel claims actually decided by the State courts, this Court cannot discern any unreasonableness in their disposition of those claims.

As to those ineffective assistance of counsel claims that were not presented to the State courts, the core of these claims relates to Petitioner's trial counsel's effectiveness on the DNA evidence and testimony. Based upon the state courts' finding, Petitioner's trial counsel was aware of the State's DNA expert and the testimony on the results of the DNA testing. A the state court found, trial counsel "developed a strategy to account for the anticipated DNA evidence". Gilliland, 2003 WL 22703227, at *7. Thus, trial counsel's investigation made him aware that the State's DNA testimony about blood traces found in the petitioner's truck. From trial counsel's investigation or strategy, the presence of the blood could be accounted for based on the victim's presence in the petitioner's truck on an earlier occasion and/or transfer while the investigating officers were collecting evidence Id. ** at 4-5.

Significantly, Petitioner has not made any challenge to the state courts' findings on the probative value of any further DNA testing.

> **The specimens retrieved from the vehicles in this case have already been compared to the Petitioner's and the victim's blood samples. This evidence was available to the Petitioner at the time of trial and was used by the State at trial as evidence of the Petitioner's guilt. See Gilliland, 1998 WL 800191, at *4. Further testing would not resolve any issue not resolved by the previous analysis.**

22

Finally, as the State argues, **identifying the donor of the trace amount of DNA in the victim's vehicle would not exonerate the Petitioner as the perpetrator of the murder of Bobby Bush. The Petitioner seeks DNA testing in order to establish the identity of this third party. Such evidence, however, would at best simply establish that this third party had, at some point in time (but not necessarily at the time of the crime), had contact with the victim.** See Alley, 2004 WL 1196095, at *10. On direct appeal, this Court summarized the evidence sufficient to uphold the Petitioner's conviction:

\* \* \*

Contrary to the assertions of the Petitioner, **the determination of the identity of this unidentified individual will not eliminate him as the perpetrator of this murder. Accordingly, we conclude that the post-conviction court has not abused its discretion in finding that the Petitioner had not established the qualifying criteria for DNA testing and that summary dismissal was appropriate**.

Gilliland, 2008 WL 624931 at **3-4 (emphasis added).

Assuming that reasonable counsel would exhaust all possible persons as the murderer, in light of these findings on the results of the prior DNA testing, the Court does not discern any prejudice to the Petitioner in his trial counsel's evaluation and strategy on the State s DNA evidence. The state's expert witness on the DNA test results actually provides proof of the presence of another person in the area of the truck, a fact consistent with the defense theory that Petitioner was not the murderer. In light of the other circumstantial evidence against the Petitioner, the Court concludes that there are not any facts that prove any prejudice to Petitioner due to any possible ineffectiveness of his trial counsel's strategy on responding to the DNA evidence. Petitioner must show a deficient performance and actual prejudice due to his trial counsel's cited omissions. Petitioner has failed to do so. These claims lack merit.

23

## 6. Actual Innocence

This claim must be evaluated in light of the State courts' findings on the sufficiency of the evidence. In summary, the Tennessee Court of Criminal Appeals found:

> The defendant was convicted of felony murder. Felony murder requires a jury to find beyond a reasonable doubt that the defendant killed the victim in the perpetration of or attempt to perpetrate a robbery. Tenn.Code Ann. § 39-13-202(a)(2). Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear. Tenn.Code Ann. § 39-13-401.
>
> The state presented evidence showing the defendant had little money on the night of July 19, 1995; while the victim had a great deal of money. Several hours later, the defendant had an abundance of cash, while the victim was found dead with only some change on him. The state presented evidence that the victim's blood was found in the defendant's truck after the defendant stated the victim had never been in his truck. Paint consistent with paint samples taken from the victim's truck was found on the defendant's bumper. The state presented evidence that the defendant was killed with a .20 gauge shotgun slug. The defendant was known to have had a .20 gauge shotgun and slug ammunition in his possession prior to, and after, the murder. The defendant was untruthful as to his whereabouts at the time immediately following the victim's murder. Taken in a light most favorable to the state, the evidence is sufficient for a jury to find beyond a reasonable doubt that the defendant killed the victim in the perpetration of a robbery.
>
> This issue is without merit.

Gilliland, 1998 WL 800191, at **8, 9.

The actual innocence doctrine falls into two categories, procedural and substantive. Schlup v. Delo, 513 U.S. 298, 314 (1995). The substantive actual innocence claim is where the habeas petitioner's trial is error free, but the habeas petitioner presents proof that he is actually innocent of the offense, id., or where the petitioner alleges that he is "actually innocent of the death penalty". Id. at 323 (citing Sawyer v. Whitley, 505 U.S. 333, 336, 347 (1992)). For this type of claim, there is an "extraordinary" standard of review. Id. at 316. The Supreme Court

explained that: "[T]he evidence of innocence would have had to be strong enough to make the

execution 'constitutionally intolerable' *even if* the conviction was a product of a fair trial." Id.

(emphasis in the original). The phrase "'actual innocence' means factual innocence, not mere

legal insufficiency." Bousley v. United States, 523 U.S. 614, 623 (1998).

The second type is the procedural "actual innocence" doctrine that rests upon

constitutional claims that are otherwise barred for a procedural default and the lack of a showing

of cause and prejudice. Schulp, 513 U.S. at 314. For the procedural actual innocence doctrine,

the Supreme Court described a lesser burden of proof as follows:

> Accordingly, we hold that the Carrier "probably resulted" standard rather than the
> more stringent Sawyer standard must govern the miscarriage of justice inquiry
> when a petitioner who has been sentenced to death raises a claim of actual
> innocence to avoid a procedural bar to the consideration of the merits of his
> constitutional claims.
>
> The Carrier standard requires the habeas petitioner to show that "a constitutional
> violation has probably resulted in the conviction of one who is actually innocent."
> 477 U.S., at 496, 106 S.Ct., at 2649-2650. To establish the requisite probability,
> the petitioner must show that it is more likely than not that no reasonable juror
> would have convicted him in the light of the new evidence. The petitioner thus is
> required to make a stronger showing than that needed to establish prejudice At
> the same time, the showing of "more likely than not" imposes a lower burden of
> proof than the "clear and convincing" standard required under Sawyer. The
> Carrier standard thus ensures that petitioner's case is truly "extraordinary,"
> McCleskey, 499 U.S., at 494, 111 S.Ct., at 1470, while still providing petitioner a
> meaningful avenue by which to avoid a manifest injustice.
>
> Carrier requires a petitioner to show that he is "actually innocent." As used in
> Carrier, actual innocence is closely related to the definition set forth by this Court
> in Sawyer. To satisfy the Carrier gateway standard, a petitioner must show that it
> is more likely than not that no reasonable juror would have found petitioner guilty
> beyond a reasonable doubt.

Id. at 326-27 (footnotes omitted).

Here, there is not any proof to support the application of this doctrine to this action and the State courts' findings about the DNA evidence precludes any relief under this doctrine.

For the above stated reasons, the Court concludes that the petition for the writ of habeas corpus should be denied.

An appropriate Order is filed herewith.

Entered this the ___28th___ day of August, 2009.

William J. Haynes, Jr.
United States District Judge